**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

MUNTADAR FADEL KHUDHEYER,
12820 N. Lamar Blvd., #1820, Austin, TX
78753;

SHAHAD SARMAD HAMEED,
12820 N. Lamar Blvd., #1820, Austin, TX
78753;

ROSA HILDA RAMIREZ FLORES,
215 Valencia Street, Apt. 1, San Francisco,
CA 94103;

MILTON ARISTEDES VALLADARES
RAMIREZ,
215 Valencia Street, Apt. 1, San Francisco,
CA 94103;

FREISY EDWARD BOBADILLA
MARTINEZ,
74 Simonton Cir., Weston, FL 33326;

ALHASSAN NABIEU SESAY,
2472 Carolina Ave., Columbus, OH 43229;

XAVIER DUPOUX,
835 NW 123rd Street, Miami, FL 33168;

CORNEILLE PHARA DUPUY NOUILLE,
835 NW 123rd Street, Miami, FL 33168;

FLAVIE SAINT JOUR,
835 NW 123rd Street, Miami, FL 33168;

COMMUNITY REFUGEE AND
IMMIGRATION SERVICES,
1925 E. Dublin-Granville Road, Suite 102,
Columbus, OH 43229;

IMMIGRANT LEGAL DEFENSE,
1322 Webster Street, Suite 300, Oakland, CA
94612;

*Plaintiffs,*

Case No.

vs.

KENNETH T. CUCCINELLI, II, *in his
purported official capacity as Senior Official
Performing the Duties of the Director of U.S.
Citizenship and Immigration Services*,
20 Massachusetts Avenue, NW, Washington,
DC 20529;

U.S. CITIZENSHIP AND IMMIGRATION
SERVICES,
20 Massachusetts Avenue, NW, Washington,
DC 20529;

CHAD WOLF, *in his purported official
capacity as Acting Secretary of the Homeland
Security*,
2707 Martin Luther King, Jr. Avenue, SE,
Washington, DC 20528;

U.S. DEPARTMENT OF HOMELAND
SECURITY
2707 Martin Luther King, Jr. Avenue, SE,
Washington, DC 20528,

*Defendants*.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.      The Immigration and Nationality Act ("INA") establishes a complex and detailed

framework for the admission and removal of noncitizens, as well as the requirements for obtaining

United States citizenship.  8 U.S.C. § 1101, *et seq.*  As relevant to this case, the INA defines several

categories of noncitizens who are inadmissible to the United States, including those who are

"likely . . . to become a public charge."  *Id.* § 1182(a)(4)(A).  In 2019, Defendant Department of

Homeland Security ("DHS") promulgated an unprecedented rule expanding the INA's "public

charge" provision to exclude from admissibility any noncitizen deemed likely to receive "one or

more public benefits," including supplemental, non-cash benefits, such as Section 8 housing

1

assistance, Medicaid, and Supplemental Nutrition Assistance Program ("SNAP"), "for more than 12 months in the aggregate within any 36-month period." *Inadmissibility on Public Charge Grounds*, 84 Fed. Reg. 41,292, 41,501 (Aug. 14, 2019) ("Public Charge Rule" or "Rule").  This lawsuit does not challenge that regulation.

2.      Defendant U.S. Citizenship and Immigration Services ("USCIS") went further than the Public Charge Rule.  Without opportunity for comment, acknowledgment, or adequate explanation for its actions, USCIS unilaterally and summarily changed the terms of the Public Charge Rule to block applicants who, under the Rule and the INA, merit admission and adjustment of status.  USCIS effected these unlawful changes through certain provisions of the USCIS Policy Manual ("Policy Manual" or "Manual"), set out in Volume 8, Part G (attached hereto, with additional excerpts, as Exhibit A).  The Policy Manual establishes "the official policies of USCIS" and "is to be followed by all USCIS officers in the performance of their duties."[1]  USCIS added yet more arbitrary conditions and burdens—also without adequate reasoning or explanation—in a new application form, Form I-944, entitled "Declaration of Self-Sufficiency" ("Form I-944" or "Form," attached hereto as Exhibit B).  This Form requires applicants to collect and submit to USCIS a mountain of unnecessary documents, including information that invades the privacy of third parties and is not required under the INA or the Public Charge Rule.

3.      *First*, the Policy Manual contravenes federal law, without acknowledgment, by raising the standard of proof for applicants to obtain adjustment of status.  The plain text of the INA requires an applicant to establish that she is not inadmissible on public charge grounds by a preponderance of the evidence—that is, that she is not "likely . . . to become a public charge."

---

[1] *About the Policy Manual*, USCIS, Dep't of Homeland Security, https://www.uscis.gov/policy-manual (last visited July 11, 2020).

8 U.S.C. § 1182(a)(4)(A).  The Public Charge Rule duly adopts the preponderance standard. 8 C.F.R. § 212.22(a).  Yet the Policy Manual, describing the "public charge" inquiry, applies a heightened burden—requiring applicants to prove their "admissibility" "clearly and beyond doubt."  8 Policy Manual Pt. G, Ch. 2.B (A-27).  Thus, under the Policy Manual, applicants who can establish that they are *not* inadmissible as "likely . . . to become a public charge" by a preponderance of the evidence may have their applications rejected or denied for failure to prove their admissibility "clearly and beyond doubt."  This heightened standard of proof violates the INA and the Public Charge Rule.  It departs from agency policy and practice without acknowledgment or adequate explanation or reason, and it conflicts with the Policy Manual's recognition in other passages that preponderance is the appropriate standard.

4.     *Second*, also without recognition or explanation, the Policy Manual departs from federal law by directing officials to count against the applicant the mere fact of filing an application for adjustment of status for legal permanent residency.  *See* 8 Policy Manual Pt. G, Ch. 12.B (A-91).  The result of this new rule is to create a novel presumption against adjustment of status that every applicant must overcome.  Neither statute nor regulation contemplates this perverse policy, and the policy further contravenes the INA and Public Charge Rule's use of the preponderance standard by weighting the evidence against the applicant from the start.  USCIS has not acknowledged this change or provided a reasoned basis for it.  Under the Policy Manual, Plaintiffs Muntadar Fadel Khudheyer, Rosa Hilda Ramirez Flores, Xavier Dupoux, Corneille Phara Dupuy Nouille, the parents of Plaintiff Alhassan Nabieu Sesay, and the stepson of Plaintiff Freisy Edward Bobadilla Martinez may be denied lawful permanent residency because they are subject to the heightened burden and will have to overcome a perverse presumption against admissibility merely because they are seeking lawful permanent residency.

5.      *Third*, the Policy Manual, also without explanation, departs from the Public Charge Rule and the INA by altering specific criteria for evaluating an application in a manner that will disqualify more applicants.  The Policy Manual treats as a negative factor whether an applicant is currently without health insurance if she cannot demonstrate ability to cover medical expenses out of pocket—even if that applicant has a prospect of obtaining health insurance, for example, during an upcoming open enrollment period.  *See* 8 Policy Manual Pt. G, Ch. 14 (A-103, A-110).  USCIS has not displayed awareness that its treatment of this criterion conflicts with the Rule.  Nor has it explained why these circumstances indicate that an applicant will tend to be more "likely . . . to become a public charge" under the INA.

6.      *Fourth*, USCIS requires applicants to submit a new form with their adjustment of status application, Form I-944, which mandates the collection of large volumes of information not contemplated under the Rule.  These requirements can only be described as an attempt to deter applications or to give USCIS the ability to reject applications as "incomplete."  Form I-944, without adequate explanation, requires applicants, and the organizations that serve them, like Plaintiffs Community Refugee and Immigration Services and Immigrant Legal Defense, to collect and submit information and documentation that is invasive of third parties' privacy, expensive to translate and certify, and unnecessary under the INA and the Public Charge Rule.  Individuals' inability to compile and submit required yet unnecessary information will lead to arbitrary rejections or denials of applicants who are admissible under federal law.  USCIS has not attempted to explain either why all of this information is always necessary or why failure to furnish it in the required form should result in rejections or denials.

7.      The plain effect of the Policy Manual and Form I-944 is to burden, deter and disqualify deserving applicants, in contravention of the INA and the Public Charge Rule, and to

produce arbitrary and unlawful denials of meritorious applications.  Without explanation or recognition that it was adopting additional conditions for admission or adjustment of status, USCIS has burdened applicants with new requirements lacking basis in law.  The Policy Manual and the Form deprive applicants of legally established rights and deter other deserving noncitizens from even applying.

8.      Plaintiffs, individual applicants and their sponsors, as well as non-profit organizations that assist individuals in applying for adjustment of status, ask this Court to declare unlawful and set aside Volume 8, Part G of the USCIS Policy Manual, entitled, "Public Charge Ground of Inadmissibility," as well as Form I-944, under the Administrative Procedure Act ("APA") as contrary to law, as improperly promulgated legislative rules, and as arbitrary, capricious, and an abuse of discretion.

9.      Additionally, both the Policy Manual and Form I-944 are invalid because, at the time of their approval, adoption, and publication, neither the Secretary of Homeland Security nor the Director of USCIS was validly appointed or confirmed; they lacked legal authority to serve in their roles, pursuant to the Appointments Clause of the U.S. Constitution or the Federal Vacancies Reform Act, or to promulgate the challenged Policy Manual and Form I-944.  A court in this district has held unlawful the appointment of Defendant Kenneth T. Cuccinelli, II.  *See L.M.-M. v. Cuccinelli*, No. 19-cv-2676-RDM, __ F. Supp. 3d __, 2020 WL 985376 (D.D.C. Mar. 1, 2020). For this independent reason, the Policy Manual and Form I-944 should be declared invalid and set aside.

## **THE PARTIES**

10.      Plaintiff Muntadar Fadel Khudheyer is an electrical and electronic engineer with bachelor and master's degrees; he is a dual citizen of Iraq and the United Kingdom.  He lives in Austin, Texas with his wife, Shahad Sarmad Hameed, who came to the U.S. as a refugee and is

now a lawful permanent resident; their daughter; and his wife's brother.  Mr. Khudheyer has applied for adjustment of status via a family-based visa petition submitted by his wife.  (This is called a "one-step adjustment" because the petition and application are filed and considered concurrently.)  Mr. Khudheyer has never applied for or received public benefits.  He does not yet have health insurance, but plans to get insurance during an upcoming open-enrollment period in November 2020.  While Mr. Khudheyer was living and working as an engineer in London in 2017, his wife arrived in the United States alone, as a refugee, and received SNAP and Medicaid.  As a refugee, she was exempt from the "public charge" ground of inadmissibility under the INA and the Public Charge Rule.  Mr. Khudheyer is not "likely. . . to become a public charge" under federal law.  Nevertheless, the Policy Manual and Form I-944 tilt the process against him by elevating the standard of proof and counting the very fact of his application, among other factors, against him.

11.     Plaintiff Shahad Sarmad Hameed is married to Mr. Khudheyer.  Ms. Hameed has submitted a family-based visa petition for her husband to remain with their family in the United States; that petition remains pending before USCIS.  Before her husband's arrival in the United States, Ms. Hameed, as a refugee, received SNAP and Medicaid, and she re-enrolled in Medicaid after becoming pregnant in 2018.  She is currently receiving transitional Medicaid, a time-limited benefit for former Medicaid recipients whose income exceeds the eligibility threshold.  Her transitional Medicaid will expire in August 2020.  Ms. Hameed fears her family will be separated, and her husband denied lawful permanent resident status under the Policy Manual and Form I-944, based on her prior receipt of benefits—even though federal law exempts her from the "public charge" inquiry based on receipt of those benefits.

12.     Plaintiff Rosa Ramirez Flores, age 67, is an applicant for adjustment of status.  Ms. Ramirez Flores has lived in the United States since 1994 and is a resident of San Francisco,

California.  She currently holds Temporary Protected Status and is a citizen of El Salvador.  Her son and sponsor, Milton Aristedes Valladares Ramirez, is a U.S. citizen.  Ms. Ramirez Flores is retired and a dependent of her son.  She has never received public benefits, except for receipt of state-funded health services through California's Medi-Cal program.  She is not "likely . . . to become a public charge" under the terms of the INA or the Public Charge Rule.  The Policy Manual makes it more difficult for her to establish her admissibility by raising the standard of proof and erecting additional evidentiary burdens by counting against her the mere fact of her application.

13.     Plaintiff Milton Aristedes Valladares Ramirez is a U.S. citizen and sponsor for his mother, Ms. Ramirez Flores.  He supports himself and his mother, and they have considerable joint savings.  For the past several years, he has been fully employed at a restaurant called Harvey's, a local institution in the Castro neighborhood of San Francisco.  Mr. Ramirez was temporarily unemployed due to the restaurant's closure during the COVID-19 pandemic, but he recently found employment in a dining room at a senior living facility.

14.     Plaintiff Alhassan Nabieu Sesay is a U.S. citizen who works two jobs as a practical nurse.  He lives in Columbus, Ohio, with his parents, his fiancée, and their two-year-old son.  He was born in Sierra Leone and immigrated to the United States after receiving a diversity visa in 2013.  Mr. Sesay came to the United States to improve his education and employment opportunities and to pursue a better life for himself and his family.  Mr. Sesay is sponsoring his parents, Katiatu Kargbo and Nabieu Sesay, for lawful permanent residency.  Mr. Sesay has submitted family-based visa petitions for his parents, and pursuant to those petitions, his mother and father have submitted applications for adjustment of status.  Both Ms. Kargbo and Mr. Sesay (Sr.) earned diplomas from religious schools; she tended the family's farm and managed the household, and he was a business manager.  They each speak three languages and are currently learning English.  They were both

self-employed in Sierra Leone as traders until 2017, when they had enough savings to retire.  Under the INA and the Public Charge Rule, they are not "likely . . . to become a public charge":  They have never applied for or received public benefits.  The Policy Manual and Form I-944 nevertheless weight the process against them by increasing the evidentiary burden and counting against them the mere fact of their applications.

15.     Plaintiff Freisy Edward Bobadilla Martinez is a United States citizen.  He lives in Weston, Florida, where he owns his own business.  He has never received public benefits.  He lives with his wife and two biological children, as well as with his stepson, a student, for whom Mr. Bobadilla Martinez has submitted an application for adjustment of status.  The application is currently pending before USCIS.  Under the INA and the Public Charge Rule, his stepson is not "likely . . . to become a public charge," but the Policy Manual and Form I-944 nevertheless weight the process against him by increasing the evidentiary burden and counting against him the mere fact of his application.

16.     Plaintiff Xavier Dupoux is a postsecondary student in Miami, Florida.  He plans to become an entrepreneur.  He came to the United States as a child, through the Haitian Family Reunification Parole Program ("HFRP"), and, for a period, received SNAP and federally funded Medicaid prior to 2020.  Mr. Dupoux has applied for adjustment of status to become a lawful permanent resident.  Under the INA and the Public Charge Rule, he is not "likely . . . to become a public charge," but the Policy Manual and Form I-944 nevertheless weight the process against him by increasing the evidentiary burden and counting against him the mere fact of his application.

17.     Plaintiff Corneille Phara Dupuy Nouille was born in Haiti.  She is the mother of Xavier Dupoux; she also has a daughter, who is a U.S. citizen.  Ms. Nouille's mother, Flavie Saint Jour, left Haiti (and her family) when Ms. Nouille was only a teenager.  They were reunited in

2017, when Ms. Nouille and her son came to the United States through the HFRP. Ms. Nouille is enrolled in a GED program and intends to find fulltime employment when she earns her degree. For a period, she, like her son, received SNAP and Medicaid before 2020. She has applied to become a lawful permanent resident to keep her family together. Under the INA and the Public Charge Rule, she is not "likely . . . to become a public charge," but under the Policy Manual and Form I-944, she faces an increased evidentiary burden and will have counted against her the mere fact of her application.

18.     Plaintiff Flavie Saint Jour is a U.S. citizen. She petitioned to bring her family to the United States under the HFRP. She works at a Hyatt Hotel, where she has been employed since 1998. She has submitted a family-based petition for her daughter and grandson to remain in the United States. Ms. Saint Jour fears that her family will be torn apart under the Policy Manual's directives.

19.     Plaintiff Community Refugee and Immigration Services ("CRIS") is an independent non-profit organization that serves the refugee and immigrant populations in central Ohio. CRIS's programs and services aim to facilitate clients' sustained self-sufficiency and successful integration in the United States. Among other things, CRIS assists clients with pending applications for admission and adjustment of status that stand to be unlawfully and arbitrarily denied by USCIS under the Policy Manual and Form I-944. CRIS has diverted and continues to divert significant resources as a result of the Policy Manual and Form I-944, including spending personnel hours and resources evaluating applications and assisting with collection and certified translation of onerous documentation that is not relevant to or contemplated by the Public Charge Rule or the INA. CRIS estimates that it now takes staff at least four times the number of hours to complete an adjustment of status application than it did previously, due to the Policy Manual's

heightened evidentiary burden and Form I-944's additional documentation requirements. Moreover, CRIS staff members spend considerable time each week on the phone, counseling individuals who express fear about the Policy Manual and Form I-944's requirements. Many of these individuals have suggested they may be deterred from applying for adjustment of status altogether as a result of the heightened standard of proof under the Policy Manual and the burdens associated with completing Form I-944. The Policy Manual and Form I-944 have impacted CRIS's mission by blocking people it serves from remaining in the United States and deterring them from seeking lawful permanent residency. And the Policy Manual and Form I-944 have further hampered CRIS's ability to serve clients, as the onerous procedures require staff resources and hours that must be diverted from other core programming, reducing the number of individuals and families CRIS can help.

20.     Plaintiff Immigrant Legal Defense ("ILD") is an independent non-profit organization based in Oakland, California. ILD provides legal services to underserved immigrant communities, including representing immigrant families, young adults, and other individuals in pending family-based visa petitions, adjustment of status, and removal defense. ILD has diverted and continues to divert significant resources due to the Policy Manual and Form I-944, including spending personnel hours evaluating many aspects of each individual's applications and assisting with the collection and certified translation of documents that are unnecessary under the Public Charge Rule and the INA. Because of the Policy Manual's heightened standard of proof and Form I-944's burdensome paperwork requirements, ILD estimates that its staff must spend at least four or five times the number of hours to complete a single adjustment of status application as before. This detracts from ILD's ability to serve its clients and community; ILD is able to serve fewer clients because each application has become so time- and resource-intensive. What is more, clients

and community members represent that they may be deterred from applying at all or unable to complete applications due to the Policy Manual and Form I-944's heightened standard of proof and onerous documentation burdens.  The Policy Manual and Form I-944 have materially impacted ILD's mission by threatening to block people it serves from remaining in the United States.

21.     Defendant Kenneth T. Cuccinelli, II, is sued in his purported official capacity as the Senior Official Performing the Duties of the Director of the U.S. Citizenship and Immigration Services, which is located at 20 Massachusetts Avenue, NW, Washington, DC 20529.  USCIS is a component of DHS.  Mr. Cuccinelli simultaneously purports to hold the position of Senior Official Performing the Duties of the Deputy Secretary of Homeland Security.

22.     Defendant USCIS is a federal agency headquartered in Washington, DC, at 20 Massachusetts Avenue, NW, Washington, DC 20529.

23.     Defendant Chad Wolf is sued in his purported official capacity as Acting Secretary of Homeland Security, whose office is located at 2707 Martin Luther King, Jr. Avenue, SE, Washington, DC 20528.

24.     Defendant DHS is a federal agency headquartered in Washington, DC, at 2707 Martin Luther King, Jr. Avenue, SE, Washington, DC 20528.

## JURISDICTION AND VENUE

25.     This Court has jurisdiction under 28 U.S.C. § 1331 because this action arises under federal law.  The Court has remedial authority pursuant to 5 U.S.C. § 702 and 28 U.S.C. § 2201.

26.     Venue is proper pursuant to 28 U.S.C. § 1391(e)(1) because Defendants are officers and agencies of the United States located in the District of Columbia, and a substantial part of the events or omissions giving rise to the claim occurred in this District, namely, the formulation, approval, and publication of the Policy Manual and Form I-944 challenged in this action.

## FACTUAL ALLEGATIONS

27.      In the Policy Manual and Form I-944, USCIS adopted new draconian requirements in conflict with, not authorized by, or otherwise departing from the INA and the Public Charge Rule.  USCIS effected these changes without acknowledgment of their departure from prior policy, adequate explanation, reasoned basis, or opportunity for public comment.

**A.      The "Public Charge" Ground for Inadmissibility.**

28.      The INA provides that the government may deny admission to the United States or adjustment of status to a noncitizen who it determines is "likely at any time to become a public charge."  8 U.S.C. § 1182(a)(4)(A).

29.      The "public charge" ground for inadmissibility originated in the 1882 Immigration Act.  That Act excluded "any person unable to take care of himself or herself without becoming a public charge."[2]

30.      Over the ensuing years, both courts and the Executive branch have consistently interpreted the phrase "public charge" in accordance with its ordinary meaning: A person who is "primarily dependent" on the government for subsistence.  Congress never sought to redefine the provision in any way that deviated from that ordinary meaning.

31.      Prior to 2019, neither Congress nor the Executive branch treated receipt of supplemental non-cash benefits as rendering a person a public charge.  Congress addressed concerns about noncitizens' receipt of certain public benefits through separate legislation specifically addressing eligibility for those benefits, rather than amending the definition of "public charge" under the INA with regard to admissibility to the United States.  In 1996, Congress passed

---

[2] Act of Aug. 3, 1882, 47th Cong. ch. 376, § 2, 22 Stat. 214.

the "Personal Responsibility and Work Opportunity Reconciliation Act of 1996" ("PRWORA"), which limited immigrants' eligibility for certain means-tested federal, state, and local benefits.[3] Also in 1996, Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), amending the INA. That amendment did not define the term "public charge," but codified the minimum factors to be considered in a public charge adjudication. IIRIRA also established an enforceable affidavit of support requirement for most applicants immigrating through family members.[4]

32.     In 1999, the predecessor agency to USCIS, the Immigration and Naturalization Service ("INS"), issued a policy document entitled *Field Guidance on Deportability and Inadmissibility on Public Charge Grounds*, 64 Fed. Reg. 28,689 (May 26, 1999) ("Field Guidance"). The Field Guidance "summarize[d] longstanding law with respect to public charge" inadmissibility and provided guidance in light of IIRIRA and PRWORA. *Id.* at 28,689. It defined the term "public charge" as an individual "primarily dependent on the government for subsistence, as demonstrated by either (i) the receipt of public cash assistance for income maintenance; or (ii) institutionalization for long-term care at government expense." *Id.*[5] The policy distinguished "cash assistance for income maintenance"—which it deemed relevant to the inquiry—from non-cash benefits and other types of benefits that may be provided in the form of cash, which it deemed irrelevant—including receipt of or participation in healthcare benefits, food programs, and childcare subsidies. *Id.* The guidance explained that "[t]he existence or absence of a particular

---

[3] Pub. L. No. 104-193, 110 Stat. 2105.

[4] Pub. L. No. 104-208, 110 Stat. 3009.

[5] INS also published a parallel proposed rule. *Inadmissibility and Deportability on Public Charge Grounds*, 64 Fed. Reg. 28,676, 28,681, 28,684 (May 26, 1999). The agency did not finally promulgate the rule.

factor should never be the sole criterion for determining if an [applicant] is likely to become a public charge." *Id.* at 28,690.

33.    A document called the "Adjudicators' Field Manual" memorialized these policies for admissibility, adjustment of status, and other determinations.  The Adjudicators' Field Manual stated, among other policies, that the "standard of proof applied in most administrative immigration proceedings is the 'preponderance of the evidence' standard," unless the burden is otherwise specified by statute.  *See* I Adjudicator's Field Manual 11.1, USCIS, Dep't of Homeland Security, 2007 WL 3376295 (updated through Sept. 9, 2014).

34.    The 1999 policy and Adjudicators' Field Manual remained the basis of public charge determinations until they were replaced by the Public Charge Rule and here-challenged USCIS Policy Manual and Form I-944.

**B.    Promulgation of the 2019 Public Charge Rule.**

35.    On October 10, 2018, DHS issued a Notice of Proposed Rulemaking proposing changes to the regulations applying the "public charge" ground for inadmissibility.  *See Inadmissibility on Public Charge Grounds*, 83 Fed. Reg. 51,114 (Oct. 10, 2018).  On August 14, 2019, DHS promulgated a final rule, entitled *Inadmissibility on Public Charge Grounds*, 84 Fed. Reg. 41,292 (Aug. 14, 2019) (the final regulatory provisions of which are attached hereto as Exhibit C).  The Public Charge Rule made dramatic changes to the legal framework governing "public charge" admissibility.

36.    The Rule excludes from admissibility any noncitizen who is deemed likely to receive "one or more public benefits . . . for more than 12 months in the aggregate within any 36-month period."  8 C.F.R. § 212.21(a).  It further defines "public benefit" to include a much broader set of assistance programs than previously considered—including non-cash benefits such as Section 8 housing assistance, Medicaid, and SNAP.  *Id.* § 212.21(b).

37.     The Rule prescribes what applicants must show and how immigration officers should decide whether an applicant is, under the INA, "likely at any time to become a public charge."  8 U.S.C. § 1182(a)(4)(A).

38.     Consistent with the INA's plain terms and longstanding agency policy, the Rule is clear that an applicant must establish admissibility by a preponderance of the evidence.  *See* 8 C.F.R. §§ 212.21(c), 212.22(a).  That is, under the preponderance standard, an applicant must establish that he or she is *not* "likely at any time to become a public charge."   8 U.S.C. § 1182(a)(4)(A); *see generally INS v. Cardoza-Fonseca*, 480 U.S. 421, 431 (1987) (describing the preponderance standard, "more likely than not," as a greater than "50% chance").

39.     DHS was unequivocal in the Rule that it "*ha[d] not changed* th[e] standard of proof with respect to application subject to a public charge inadmissibility determination," and "preponderance of the evidence" would remain the operative standard.  84 Fed. Reg. at 41,397 (emphasis added).

40.     The Rule also establishes what factors about an applicant adjudicators may and must consider, and how precisely adjudicators should weigh those factors.

41.     The Rule sets out the factors that are relevant to whether an applicant is "likely at any time in the future to become a public charge."  8 C.F.R § 212.22.  These factors must be considered in the "totality of the . . . circumstances."  *Id.* § 212.22(a).  And the adjudication must focus on the applicant's "likelihood of becoming a public charge," consistent with the INA and the Rule.  *Id.*

42.     The Public Charge Rule enumerates four factors that it designates as reasonably direct measures of an applicant's likelihood of becoming a "public charge."  *Id.* § 212.22(c)(1).

The Rule deems these as automatically "[h]eavily weighted negative" in the totality of the circumstances. *Id.*

43.     The difference between relevant factors and "heavily weighted negative factors" is important to the Rule's scheme.  A relevant factor can be considered by an adjudicator, but it does not automatically deduct from an applicant's ability to carry his or her burden of demonstrating admissibility. *See id.* § 212.22(b).  By contrast, a "[h]eavily weighted negative factor[]"—as a more direct proxy for an applicant's likelihood to "become a public charge"—diminishes the applicant's ability to demonstrate admissibility, absent sufficient countervailing positive factors in the totality of the circumstances. *Id.* § 212.22(c).

44.     The Rule provides that only the following are "[h]eavily weighted negative factors": the applicant: (i) "is not a full-time student and is authorized to work, but is unable to demonstrate current employment, recent employment history, or a reasonable prospect of future employment"; (ii) "has received or has been certified or approved to receive one or more public benefits, as defined in § 212.21(b), for more than 12 months in the aggregate within any 36-month period"; (iii) "has been diagnosed with a medical condition that is likely to require extensive medical treatment or institutionalization or that will interfere with the [applicant's] ability to provide for himself or herself, attend school, or work; and . . . is uninsured and has neither the prospect of obtaining private health insurance, nor the financial resources to pay for reasonably foreseeable medical costs related to such medical condition"; or (iv) "was previously found inadmissible or deportable on public charge grounds by an Immigration Judge or the Board of Immigration Appeals." *Id.* § 212.22(c)(1).

45.     The Rule is clear that, together with any "[h]eavily weighted negative factors," an adjudicator must consider *all* relevant factors to determine whether, in the totality of the

circumstances, the applicant is, by a preponderance of the evidence, "likely" or "not likely" to become a "public charge."  *Id.* § 212.22(c).

46.     The Public Charge Rule also requires applicants for adjustment of status to report certain information related to public benefits.  But it provides, consistent with federal statute, that benefits received by third parties are irrelevant; the Rule maintains that certain classes of immigrants (such as refugees, asylees, petitioners under the federal Violence Against Women Act, and certain T and U visa applicants) are exempt from the public charge ground of inadmissibility. *Id.* §§ 212.20–212.23.

47.     The Public Charge Rule was scheduled to take effect on October 15, 2019. However, five different district courts enjoined the Rule as likely unconstitutional or otherwise unlawful.  *See Make the Road N.Y. v. Cuccinelli*, 419 F. Supp. 3d 647 (S.D.N.Y. 2019), *stay denied pending appeal*, 2019 WL 6498283 (S.D.N.Y. Dec. 2, 2019); *New York v. Dep't of Homeland Sec.*, 408 F. Supp. 3d 334 (S.D.N.Y. 2019), *stay denied pending appeal*, 2019 WL 6498250 (S.D.N.Y. Dec. 2, 2019), *aff'd in consolidated opinion*, 2020 WL 95815 (2d Cir. Jan. 8, 2020), *stay granted*, 140 S. Ct. 599 (2020); *Cook Cty. v. McAleenan*, 417 F. Supp. 3d 1008 (N.D. Ill. 2019), *aff'd sub nom. Cook Cty. v. Wolf*, No. 19-3169, __F.3d__, 2020 WL 3072046 (7th Cir. June 10, 2020); *CASA de Maryland, Inc. v. Trump*, 414 F. Supp. 3d 760 (D. Md. 2019), *stay denied pending appeal*, 2019 WL 7565389 (D. Md. Nov. 4, 2019), *appeal docketed*, No. 19-2222 (4th Cir. Nov. 4, 2019); *Washington v. Dep't of Homeland Sec.*, 408 F. Supp. 3d 1191 (E.D. Wash. 2019); *City & Cty. of San Francisco v. USCIS*, 408 F. Supp. 3d 1057 (N.D. Cal. 2019) (consolidated opinion), *stay granted*, 944 F.3d 773 (9th Cir. 2019).

48.     The Rule remained on hold until February 24, 2020, taking effect only after the Supreme Court stayed nationwide interim relief.  *See Wolf v. Cook Cty.*, 140 S. Ct. 681 (2020);

17

*Make the Road N.Y. v. Cuccinelli*, No. 19 Civ. 7993, 2019 WL 5589072 (S.D.N.Y. Oct. 11, 2019);

*New York v. Dep't of Homeland Sec.*, 408 F. Supp. 3d 334 (S.D.N.Y. 2019, *stay granted in consolidated opinion*, *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599 (2020), *denying modification of stay*, No. 19A785, 2020 WL 1969276 (U.S. Apr. 24, 2020).[6]

49.    This suit does not challenge the Rule's validity, which remains a live issue in other cases.

**C.    Publication of the USCIS Policy Manual and Form I-944.**

50.    On February 5, 2020, USCIS issued an alert stating that the agency was publishing "the USCIS Policy Manual to address the Inadmissibility on Public Charge Grounds Final Rule."[7] The Policy Manual purported to "incorporate[] the [Public Charge] Rule."[8]

51.    The Policy Manual establishes "the official policies of USCIS" and states that it "is to be followed by all USCIS officers in performance of their duties."[9]   "[T]he Policy Manual is controlling . . . effective as of February 24, 2020," and "supersedes any prior guidance on the topic," including the Adjudicators' Field Manual.[10]

---

[6] USCIS has not updated the original effective date on Form I-944 nor its instructions, instead instructing users through its website to "[p]lease read all references to Oct. 15, 2019, as though they refer to Feb. 24, 2020." *I-944, Declaration of Self-Sufficiency*, USCIS, Dep't of Homeland Security, https://www.uscis.gov/i-944 (last visited July 12, 2020).

[7] *Policy Alert, Public Charge Ground of Inadmissibility*, USCIS, Dep't of Homeland Security (Feb. 5, 2020), https://www.uscis.gov/sites/default/files/policymanual/updates/20200205-Public Charge.pdf.

[8] *Id.*

[9] *About the Policy Manual*, USCIS, Dep't of Homeland Security, https://www.uscis.gov/policy-manual (last visited July 11, 2020).

[10] *Policy Alert, Public Charge Ground of Inadmissibility*, USCIS, Dep't of Homeland Security (Feb. 5, 2020), https://www.uscis.gov/sites/default/files/policymanual/updates/20200205-Public Charge.pdf.

52.     Volume 8 of the Policy Manual, entitled "Admissibility," contains "Part G," a dedicated discussion of the "Public Charge Ground of Inadmissibility."  *See* 8 Policy Manual, Pt. G.[11]  This Part comprises twenty chapters purporting to explain the purpose, background, and application of the Public Charge Rule, in addition to individual chapters focused on each factor to be considered in a "public charge" determination.

53.     At the same time, USCIS republished several revised forms that applicants must complete when seeking admission to comply with the public charge inquiry, including those seeking adjustment of status.[12]

54.     USCIS also released a new eighteen-page form, Form I-944, "Declaration of Self Sufficiency," as of February 24, 2020, which must accompany adjustment of status applications and other applications for immigration benefits that are subject to the public charge ground of inadmissibility.

### 1.      The USCIS Policy Manual.

55.     The Policy Manual does not "incorporate[]" the Public Charge Rule.  The Policy Manual contradicts and departs from the Public Charge Rule and the INA without adequate

---

[11]   *USCIS Policy Manual*, Volume 8, Part G, USCIS, Dep't of Homeland Security, https://www.uscis.gov/policy-manual/volume-8-part-g (last visited July 12, 2020).

[12] Those include: Form I-129, Petition for a Nonimmigrant Worker; Form I-129CW, Petition for a CNMI-Only Nonimmigrant Worker; Form I-485, Application to Register Permanent Residence or Adjust Status; Form I-485 Supplement A, Supplement A to Form I-485, Adjustment of Status Under Section 245(i); Form I-485J, Confirmation of Bona Fide Job Offer or Request for Job Portability Under INA Section 204(j); Form I-539, Application to Extend/Change Nonimmigrant Status; Form I-539A, Supplemental Information for Application to Extend/Change Nonimmigrant Status; Form I-601, Application for Waiver of Grounds of Inadmissibility; Form I-864, Affidavit of Support Under Section 213A of the INA; Form I-864A, Contract Between Sponsor and Household Member; Form I-864EZ, Affidavit of Support Under Section 213A of the INA; Form I-912, Request for Fee Waiver.

acknowledgment, explanation, or reasoned basis.  The Policy Manual diverges from the INA and the Public Charge Rule—and unlawfully burdens applicants—in two key respects.

56.     *First*, the Policy Manual contradicts the INA and the Rule by changing the standard of proof.  Both statute and regulation require the "preponderance of the evidence" standard in public charge admissibility determinations.   The Policy Manual contravenes federal law by incorporating an additional "clearly and beyond doubt" standard to demonstrate admissibility for an adjustment of status.  8 Policy Manual Pt. G, Ch. 2.B (A-27).  This change threatens to wrongly deny noncitizens who can establish admissibility as not "likely . . . to become a public charge" under the preponderance standard—and are therefore admissible by statute and regulation, as well as longstanding USCIS policy and practice—but who do not meet the Policy Manual's higher-still "clearly and beyond doubt" threshold.  The Policy Manual does not acknowledge or explain this change, and it is internally inconsistent and unclear as to the application of the standard of proof.

57.     *Second*, the Policy Manual departs from the Public Charge Rule and conflicts with the INA concerning how certain factors should be considered by USCIS officials—including automatically weighting the mere fact of the application against an individual seeking adjustment of status to become a lawful permanent resident.  *See* 8 Policy Manual Pt. G, Ch. 12.B (A-91).  This change increases the evidentiary burden on applicants further still, contravening the statutorily required preponderance standard and distorting the totality-of-the-circumstances framework established by the Public Charge Rule.  USCIS has not acknowledged its departure from the INA or the Public Charge Rule or furnished an adequate explanation or reasoned basis for its changes.

### i.      The Policy Manual Changes the Standard of Proof.

58.      Without opportunity for public comment, acknowledgement, or explanation, the Policy Manual contradicts the INA and the Public Charge Rule by raising and fundamentally changing the standard of proof for applicants.

59.      The INA, at Section 212(a)(4)(A), provides that an applicant is inadmissible on "public charge" grounds only if, "at the time of application for admission or adjustment of status," the applicant "is *likely* at any time to become a public charge."  8 U.S.C. § 1182(a)(4)(A) (emphasis added).  Under the INA, the "burden of proof shall be upon" the applicant "to establish that he is eligible . . . or is not inadmissible under any provision of" the INA.  *Id.* § 1361.  Read together with the "public charge" provision of the INA, the statute's plain text requires use of the "preponderance" standard for the public charge admissibility determination.  *Id.* § 1182(a)(4)(A).

60.      As the Policy Manual elsewhere acknowledges, "[t]he standard of proof applied in most administrative immigration proceedings is the preponderance of the evidence standard." 1 Policy Manual Pt. A, Ch. 4.B (A-12).  "Therefore, even if there is some doubt, if the benefit requestor submits relevant, probative, and credible evidence that leads an officer to believe that the claim is 'probably true' or 'more likely than not,' then the benefit requestor has satisfied the standard of proof."  *Id.*  So, too, "[i]n adjustment of status, the standard of proof is generally preponderance of the evidence."  7 Policy Manual Pt. A, Ch. 10.A (A-14); *see also Matter of Chawathe*, 25 I. & N. Dec. 369, 375 (A.A.O. 2010) (applicant bears the burden of proving classification sought by a preponderance of the evidence "[e]xcept where a different standard is specified by law").  Only "[i]f the requestor has not met this standard," is it "appropriate for the officer to either request additional evidence or issue a notice of intent to deny, or deny the case." 1 Policy Manual Pt. A, Ch. 4.B (A-12).

61.    Consistent with the INA and longstanding practice, the Public Charge Rule duly provides that the standard of proof for the public charge admissibility determination must be preponderance—that is, whether the applicant is "more likely than not at any time in the future to become a public charge." 8 C.F.R. § 212.21(c).

62.    The Public Charge Rule was unequivocal that it "*ha[d] not changed* th[e] standard of proof with respect to applications subject to a public charge inadmissibility determination," and "preponderance of the evidence" would remain the operative standard.  84 Fed. Reg. at 41,397 (emphasis added).

63.    The Policy Manual departs from this established standard.  The Policy Manual first tracks the INA and the Public Charge Rule regarding public charge admissibility determinations, providing: "An [applicant] is *more likely than not* at any time in the future to become a public charge if it is *probable* that . . . he or she will receive, at any time in the future, one or more public benefits for more than 12 months in the aggregate within any 36-month period." 8 Policy Manual Pt. G, Ch. 2.B (A-27) (emphases added).  But the Policy Manual then adds: "The burden of proof to establish admissibility during the process of seeking an immigration benefit is on the applicant. An applicant for adjustment of status must demonstrate that he or she is *clearly and beyond doubt* admissible to the United States."  *Id.* (emphasis added).

64.    The authority to which the Manual cites as prime support for the "clearly and beyond doubt" standard involves administrative *removal* proceedings, not applications for an immigration benefit outside the context of removal.  *See id.* (citing *Matter of Bett*, 26 I. & N. Dec. 437, 440 (B.I.A. 2014) (discussing "clearly and beyond doubt" standard in the removal context)). Removal proceedings are specially and specifically governed by a separate statutory provision, which establishes a burden-shifting framework and sets the standard of proof for the government

and the individual—including an individual's burden to prove admissibility "clearly and beyond doubt" in certain circumstances in the removal proceeding.  *See* 8 U.S.C. § 1229a.  The Public Charge Rule acknowledged that this "clearly and beyond doubt" standard by statute arises in the removal context.  *See* 84 Fed. Reg. at 41,324 ("Under . . . 8 U.S.C. 1229a(c)(2)(A), *an applicant for admission in removal proceedings* has the burden of establishing that he or she is *clearly and beyond doubt* entitled to be admitted and is not inadmissible . . . ." (emphases added)).[13]

65.     But the text of the Policy Manual does not limit the application of the "clearly and beyond doubt" standard to the removal context.  To the contrary, the Policy Manual, by its own terms, governs "decisions on benefit and service requests" and "immigration benefits administered by the agency such as citizenship and naturalization, adjustment of status, admissibility, protection and parole, nonimmigrants, refugees, asylees, immigrants, waivers, and travel and employment."[14] Without acknowledgment, the Policy Manual appears to require *all* applicants for adjustment of status to prove that they are "clearly and beyond doubt" admissible, importing the standard of proof for admissibility from removal proceedings and applying that standard outside the removal context.  *See* 8 Policy Manual Pt. G, Ch. 2.B (A-27).

66.     The Policy Manual's standard of proof thus contradicts the INA and the Public Charge Rule, which plainly mandate the preponderance standard in adjudicating the public charge

---

[13] The Policy Manual also cites "generally" to an inapposite criminal case, *House v. Bell*, 547 U.S. 518, 437–40 (2006), in which the Supreme Court affirmed that "prisoners asserting innocence as a gateway to defaulted claims must establish that in light of new evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt'" in the exceptional circumstances in that case.  *Id.* at 536–37 (quoting *Schlup v. Delo*, 513 U. S. 298, 327 (1995)).  This decision, likewise, does not support USCIS's unacknowledged departure from the preponderance standard for public charge admissibility outside the removal context.

[14] *About the Policy Manual*, USCIS, Dep't of Homeland Security, https://www.uscis.gov/policy-manual (last visited July 11, 2020).

ground of inadmissibility.  The Policy Manual does not acknowledge or explain this departure from the statute, the Rule, or agency policy and practice.

67.    The Policy Manual's discussion of the standard of proof is also internally inconsistent and unclear.  Its passage establishing the standard of proof for public charge admissibility appears first to incorporate the preponderance standard, but then imports the heightened "clearly and beyond doubt" standard with citation to a standard applied only in removal proceedings.  *See* 8 Policy Manual Pt. G, Ch. 2.B (A–26–A–27).  The Policy Manual's use of the "clearly and beyond standard" in the public charge section is also in unexplained tension with other passages of the Policy Manual, in Volumes 1 and 7, which acknowledge preponderance as the presumptive standard outside the removal context, including for adjustment of status.  *See* 1 Policy Manual Pt. A, Ch. 4.B (A-12); 7 Policy Manual Pt. A, Ch. 10.A (A-14).

### ii.    The Policy Manual Deviates from the Rule Regarding Certain Negative Factors.

68.    The Policy Manual also deviates from the Public Charge Rule with respect to its treatment of certain negative factors in an applicant's totality of circumstances.  These alterations further distort the framework established by the Public Charge Rule.  USCIS has not acknowledged or explained its changes or offered adequate reasoned basis as to why its treatment of these factors, consistent with the INA, help determine whether an applicant is "likely . . . to become a public charge."

69.    *Application for Adjustment to Lawful Permanent Resident Status.*  Under 8 C.F.R. § 212.22(b)(6), the mere fact that an applicant seeks adjustment of status to become a lawful permanent resident ("LPR") is not to be treated by itself as a negative factor to be weighed against an applicant.  Instead, the Public Charge Rule directs that "DHS will *consider* the immigration status that the [applicant] seeks and the expected period of admission *as it relates to the*

*[applicant's] ability to financially support himself or herself* during the duration of the [applicant's] stay." 8 C.F.R. § 212.22(b)(6) (emphases added). The Rule does not automatically count the fact of an application for lawful permanent residency against the applicant in each and every case when considering the totality of the circumstances.

70.     The Policy Manual, without explanation, deviates from the Rule. It directs USCIS officers to count the fact of the application against anyone applying for LPR status—making the already unlawful "clearly and beyond doubt" standard even more difficult to overcome by creating a new, automatic evidentiary deficit for every LPR applicant. 8 Policy Manual Pt. G, Ch. 12.B (A-91).

71.     The Policy Manual provides: "The expected period of stay" for individuals seeking adjustment of status "is permanent and is generally considered to be a negative factor." *Id.* "In general, aliens seeking admission as LPRs are more likely to receive public benefits than nonimmigrants because they intend to reside permanently in the United States and LPRs are eligible for more public benefits than nonimmigrants." *Id.* The Policy Manual then lists "seeking LPR status" as a "[n]egative [f]actor." *Id.*

72.     In so doing, USCIS has unlawfully and arbitrarily tilted the scales against every LPR applicant, by assigning a negative weight to the mere fact of the application, which the applicant then must compensate for through sufficient *additional* countervailing positing evidence. *See id.* Ch. 15, Scenarios 1, 3, and 5 (A-114–A-117). USCIS has not provided adequate explanation as to why such a policy makes sense.

73.     *Lack of Health Insurance.* The Public Charge Rule provides that health insurance is considered as one of the applicant's household resources; lack of health insurance may be weighted heavily negatively only where the individual has a "diagnos[is] [of] a medical condition

25

that is likely to require extensive medical treatment or institutionalization or that will interfere with the [applicant's] ability to provide for himself or herself, attend school, or work," and "has *neither* the prospect of obtaining private health insurance, *nor* the financial resources to pay for reasonably foreseeable medical costs related to" the medical condition.  8 C.F.R. § 212.22(c)(1)(iii)(A), (B). Otherwise, health insurance is listed as an example of an applicant's asset or resource to be considered holistically in determining whether an applicant will be able to cover reasonably foreseeable medical costs.  *See* 8 Policy Manual Pt. G, Ch. 9.C (A-71).

74.    The Policy Manual, without explanation, conflicts with the Public Charge Rule, changing when a lack of health insurance will count against an applicant.  The Policy Manual provides that lack of health insurance is a "[h]eavily [w]eighted [n]egative" where the applicant has a "[m]edical condition and is uninsured and *either* lacks the prospect of obtaining private health insurance *or* lacks the financial resources to pay for reasonably foreseeable medical costs related to such medical condition."  8 Policy Manual Pt. G, Ch. 9.B (A-67) (emphasis added).

75.    While the Public Charge Rule allows heavy negative weight to be assigned to a lack of health insurance only when an applicant *both* lacks the prospect of obtaining insurance *and* lacks the resources to pay out of pocket for medical expenses, the Policy Manual allows negative weight to be assigned when *either* condition is present.  *Id.*  The Policy Manual thus improperly assigns negative weight, for example, to an applicant with a medical condition and limited resources if the applicant currently lacks health insurance, even when the applicant will be able to obtain insurance during the next open enrollment season.  USCIS has not acknowledged this departure from the INA and the Public Charge Rule or offered an adequate reasoned basis for it.

### 2.    Form I-944.

76.    Form I-944 establishes additional impermissible, unexplained, and arbitrary barriers for noncitizen applicants.  The eighteen-page Form requires applicants subject to the

"public charge" ground of inadmissibility to provide unnecessary, invasive, and burdensome information about third parties, with no proper purpose under the relevant factors established by the INA and the Public Charge Rule, which focus on the *applicant*.

77.     Applicants and Plaintiff organizations that assist them must struggle to obtain all the necessary documents and possible forms of proof against the backdrop of the Policy Manual's heightened evidentiary burden and the automatic negative weight that the Policy Manual assigns to every applicant seeking to become a lawful permanent resident.

78.     Plaintiff organizations estimate that for their staff attorneys alone—not to mention their applicant-clients—Form I-944 has resulted in a 400 percent to 500 percent increase in the time it takes to complete a single adjustment of status application, including because of the demands for information about individuals other than the applicant.  The onerousness and arbitrariness of the eighteen-page Form I-944 is laid bare when considered alongside the implementing form adopted by the U.S. Department of State to gather evidence for that agency's parallel "public charge" determinations, which the Department of State has described as "align[ed]" with the Public Charge Rule.[15]  The parallel form promulgated by the Department of State, DS-5540, totals four pages.[16]  The time, resources, and difficulty of completing Form I-944 are heightened by the Policy Manual's elevated standard of proof, as applicants and their attorneys work to amass sufficient evidence to satisfy the Manual's unlawful demands.

---

[15] *Visas: Ineligibility Based on Public Charge Grounds*, 84 Fed. Reg. 54,996, 54,996 (Oct. 15, 2019).

[16] *Compare* Form I-944 *with* DS-5540, Dep't of State, https://eforms.state.gov/Forms/ds5540.PDF (last visited July 12, 2020).  Such forms must comply with the Paperwork Reduction Act, which requires agencies to minimize paperwork burdens on the public and prohibits paperwork requirements where the information is available from another source within the federal government.  *See* Paperwork Reduction Act of 1995, Pub. L. No. 104-13, 109 Stat. 163, § 2(a), 44 U.S.C. § 3507(a).

79.     USCIS will reject adjustment of status applications that do not include a completed Form I-944.  *See* 84 Fed. Reg. at 41,295; 8 Policy Manual Pt. G, Ch. 5.B (A-41).  USCIS has not explained why *all* applicants who cannot furnish *all* of the Form's invasive and unnecessary information—due to third-party privacy concerns or other practical constraints—should be rejected or denied under the INA or the Public Charge Rule.  This is unlawful and arbitrary where the evidence submitted *satisfies* the INA's and Rule's preponderance standard, proving that the applicant is not "likely . . . to become a public charge" upon consideration of the relevant factors.  The effect, however, is clear: to burden applicants, to make applications more expensive to complete, to deter applicants from applying, and to produce arbitrary denials of incomplete applications.  All of these will deprive legal status to applicants who, under federal law, are admissible.

80.     *Public Benefits Received by Third Parties*.  The INA and the Public Charge Rule establish the relevant factors for consideration; they focus on the *applicant*.  Under the Public Charge Rule, receipt of benefits by anyone other than the applicant are therefore not to be considered.  *See* 84 Fed. Reg. at 41,292.  The Rule is unequivocal on this point: "DHS will only consider public benefits received directly by the [applicant] for the [applicant's] own benefit, or where the alien is a listed beneficiary of the public benefit.  DHS will *not* consider public benefits received on behalf of another.  DHS also will *not* attribute receipt of a public benefit by one or more members of the [applicant's] household to the alien unless the alien is also a listed beneficiary of the public benefit."  *Id.* (emphases added).

81.     Form I-944 contradicts the Public Charge Rule.  It asks applicants whether "any of the income from your *or your household members'* federal tax return(s) come from public benefits."  Form I-944, Part 3, Question 4 (B-4) (emphasis added).

82.     The Policy Manual, moreover, instructs that USCIS officers must consider the information obtained on Form I-944, stating that "USCIS reviews *all* information provided in . . . the Declaration of Self-Sufficiency (Form I-944)."  8 Policy Manual Pt. G, Ch. 4 (A-36) (emphasis added).  The Policy Manual further directs officers that "[e]valuating whether an applicant is inadmissible based on the totality of the applicant's circumstances means evaluating *all* of the information provided by the applicant on the declaration of self-sufficiency."  8 Policy Manual Pt. G, Ch. 4.C (A-37) (emphasis added).

83.     By collecting information about third-party benefits, Form I-944 directs officers to consider the receipt of these benefits, contrary to the Public Charge Rule.  This includes consideration of benefits by those who may themselves be *exempt* from public charge inadmissibility—for example, family members who came to the United States as refugees or seeking asylum, for whom federal law recognizes such benefits may be important to build a life in the United States after displacement and hardship.  *See* 8 Policy Manual Pt. G, Ch. 3.B (A-28–A-31).

84.     This compounds the Policy Manual's directive that adjudicators consider whether an applicant's sponsor "has received public benefits" or a "fee waiver."  8 Policy Manual Pt. G, Ch. 13.D (A-97–A-98).  Most family-based petitions must include an affidavit of sponsorship by federal law.  *See* 8 C.F.R. § 213a.2; *see also Instructions for Form I-864*, USCIS, Dep't of Homeland Security, https://www.uscis.gov/i-864 (last visited July 10, 2020) ("This affidavit is required for most family-based petitions . . . .").  This sponsorship affidavit may be required even where the individual seeking adjustment of status will be the primary household earner, and even where the sponsor was herself exempt from public charge inadmissibility—as in the case of Plaintiff Mr. Khudheyer, whose wife, Ms. Hameed, immigrated as a refugee (so was not subject

to public charge inadmissibility) and received some public benefits before Mr. Khudheyer arrived in the United States.

85.     Form I-944 and the Policy Manual together direct consideration of public benefits received by individuals *other* than the applicant, in tension with the Public Charge Rule's plain terms and the INA's focus on factors about the *applicant*.  Form I-944's and the Policy Manual's consideration of third-party benefits is especially perverse in cases where USCIS will count against a refugee or asylee's family member that refugee or asylee's prior receipt of benefits—which federal law recognizes may be important to build a life in the United States after displacement and hardship.  USCIS has not acknowledged or explained this departure from the INA and the Rule.

86.     If, on the other hand, adjudicators will *not* consider third-party benefits asked about on Form I-944 (consistent with the Public Charge Rule), then USCIS demands collection of such information with *no* purpose.  That is arbitrary and capricious.

87.     *Detailed Information about "Household" Members.*    Form I-944 requires applicants to provide the names, dates of birth, relationships and any "Alien Registration Number" ("A-Number") for everyone included in the applicant's "household."  Form I-944, Part 2, Question 1 (B-2).

88.     "Household," in turn, is defined in the Public Charge Rule to include not only the applicant and any spouse, dependent children, other children "not physically residing with the [applicant] for whom the [applicant] provides or is required to provide at least 50 percent of the children's financial support," and any "other individual who provides the [applicant] at least 50 percent of the [applicant's] financial support, or who lists the alien as a dependent on his or her federal income tax return," but also "[a]ny *other* individuals . . . to whom the [*applicant*] provides, or is required to provide, at least 50 percent of the individual's financial support"—for instance,

an applicant's since-divorced spouse or an adult child who has moved home.  8 C.F.R. § 212.21(d)

(emphases added).

89.     The Form requires applicants for admission to provide verification of each

relationship, such as a marriage or birth certificate, or a signed statement from each person for

whom such verification is not available.  Form I-944, Part 2, Question 1 (B-2).  That information

simply may not be available to or accessed by the applicant.  For example, Form I-944 does not

display awareness of the possibility that an applicant may be unable to secure documentation from

an uncooperative ex-spouse.  And applicants may have reasonable fears about sharing this

information required by Form I-944, particularly regarding undocumented individuals.

90.     USCIS has not explained why *all* of this information regarding third parties on

whom the applicant does not purport to rely for financial support is necessary in *all* cases to

determine whether an applicant for admission is "likely . . . to become a public charge" within the

meaning of the INA or the Public Charge Rule.  Federal law establishes the factors relevant for

consideration; those factors focus on the *applicant* and those on whom the applicant will rely for

financial support, not others.[17]  For example, as to potentially relevant third-party information, the

Public Charge Rule separately provides that for any income by household members on which the

applicant intends to rely, she must furnish a tax transcript or, where not available, other credible

evidence of that third-party's income.  *See* 8 CFR § 212.22 (b)(4)(ii).  Form I-944's requiring

additional, extraneous information about others serves to deter applicants and may prevent eligible

people who are entitled to admission or adjustment of status from even applying.

---

[17] The parallel form DS-5540 does not require the collection of extraneous third-party information
comparable to Form I-944.  *See* Form DS-5540, Parts 3–4.

91.     What is more, Form I-944 requires that any statement in a language other than English must be translated and accompanied by a translator's "sign[ed] . . . certification that the English language translation is complete and accurate, and that he or she is competent to translate from the foreign language into English." *Instructions for Declaration of Self Sufficiency*, USCIS, Dep't of Homeland Security (Feb. 24, 2020), https://www.uscis.gov/i-944.  Form I-944's burdens on applicants to collect and submit invasive and irrelevant information about third parties is rendered more onerous and expensive. *Any* applicant with other "household" members, as broadly defined, is required to bear the cost of compiling and translating required information about those individuals.

92.     These requirements only add to the Policy Manual's unlawful evidentiary standard and presumption against LPR applicants.  In practice, working to overcome the Policy Manual's heightened standard and perverse presumption via evidence, as directed by Form I-944, applicants must struggle to collect any and all conceivably relevant documentation.  This includes but is not limited to, for example: birth, adoption, and marriage certificates; divorce decrees; tax returns; tax returns of other household members; other financial documents, including of other family members, and including documents from foreign countries, which require technical translation; evidence of additional (non-taxable) income, such as child support agreements or pension documents; any evidence of assets, such as bank statements, investments, retirement account statements, or evidence of ownership of stocks, bonds, and other financial instruments, including those in foreign countries that again require technical translation; real estate appraisals, including from other countries requiring translation; academic transcripts, diplomas, degrees, trade-profession certificates, or evidence of unavailability of these documents, such as a letter from the degree-granting institution; occupational certifications and licenses; certificates of mastery or

apprenticeship in skilled trades, or evidence of unavailability such as a letter from the issuing institution.

93.     Applicants labor to gather, translate, certify, and submit this information all with the fear that their applications will be rejected or denied if they are not complete, or if the evidence is not enough to overcome the Policy Manual's presumption against admissibility and its heightened evidentiary standard.  The Form's requirements, including irrelevant information about third parties, serve to discourage, deter, and disable noncitizens from applying.  Even for those who do apply, complying with Form I-944's demands in light of the Policy Manual's standards, produces significant financial and time burdens—including for the organizations who serve them.

**D.      Invalid Agency Appointments.**

94.     During the period when the Policy Manual and Form I-944 were developed, approved, and published, neither DHS nor USCIS was led by a lawfully serving Secretary or Director.  Both Offices were—and are—by law required to remain vacant, so no action, function or duty of either Office may be performed during such vacancy.  Only a properly serving Secretary or Acting Secretary of Homeland Security, or Director or Acting Director of USCIS, could promulgate the Policy Manual and Form I-944.  The Policy Manual and Form I-944 are therefore invalid for this independent reason.

**1.      The Law of Federal Appointments and Vacancies.**

95.     Pursuant to the Appointments Clause of the U.S. Constitution, the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint . . . Officers, of the United States" though Congress may "by Law vest the Appointment of such inferior Officers as they think proper, in the President alone, in the Courts of Law, or in the Heads of the Departments." U.S. Const. art. II, § 2, cl. 2.

96.     The Appointments Clause "serves both to curb Executive abuses of the appointment power . . . and to promote a judicious choice of persons for filling the offices of the union." *Edmond v. United States*, 520 U.S. 651, 659 (1997) (internal quotations marks and alterations omitted).

97.     The Federal Vacancies Reform Act, 5 U.S.C. § 3345 *et seq.* ("FVRA"), is the "exclusive means for temporarily authorizing an acting official to perform the functions and duties of any office of an Executive agency . . . for which appointment is required to be made by the President, by and with the advice and consent of the Senate" ("PAS Positions"), unless a statute provides otherwise.  5 U.S.C. § 3347(a).

98.     The FVRA limits who may serve as the acting head of an agency "[i]f an officer of an Executive agency . . . whose appointment . . . is required to be made by the President, by and with the advice and consent of the Senate . . . resigns."  *Id.* § 3345(a).

99.     When a vacancy occurs, the "first assistant to the office" becomes the acting official.  *Id.* § 3345(a)(1).  Alternatively, the President may choose as the acting official a person who serves in a different PAS Position or who spent at least 90 of the 365 days preceding the vacancy working in a federal government job paid at or above the GS-15 level of the General Schedule.  *Id.* § 3345(a)(2)–(3).

100.     The FVRA also limits the duration an office may be filled by an acting official.  In general, "the person serving as an acting officer . . . may serve in the office . . . for no longer than 210 days beginning on the date the vacancy occurs."  *See id.* § 3346.

101.     While the FVRA provides for certain modifications of that time limit based upon either the submission of a nomination to the Senate or the pendency of a Presidential Transition,

or both, the FVRA does not provide for restarting of the 210-day period due to a change in acting appointee.

102.    If there is not an FVRA-compliant official in place to perform the functions and duties of a PAS Position, the FVRA requires that "the office shall remain vacant." *Id.* § 3348(b)(1).

103.    Further, the FVRA provides that any action taken by an official who occupies the position contrary to the FVRA "shall have no force or effect."  *Id.* § 3348(d)(2).  Such actions "may not be ratified."  *Id.*

104.    The Director of USCIS is a PAS Position; any vacancy must be filled pursuant to the FVRA.

105.    When the Office of the Secretary of Homeland Security is vacant, the President lacks the authority to select an acting officer from the FVRA's categories of officials.  Rather, DHS statute provides that vacancies in the Secretary of Homeland Security's Office are to be filled by the Deputy Secretary of Homeland Security and then, if that Office is likewise vacant, by the Under Secretary for Management.  6 U.S.C. § 113(a)(1)(A), (g)(1).  Where the Offices of both the Deputy Secretary of Homeland Security and Under Secretary for Management are vacant, DHS statute provides the option of a Secretary-established order of succession.  *Id.* § 113(g)(2).  Setting or amending the order of succession is an action, function or duty of the Office of the Secretary of Homeland Security.  *See id.* (authorizing "the Secretary" of Homeland Security to establish an order of succession beyond the Under Secretary for Management); 5 U.S.C. § 3348(a) (defining "action," "function or duty" for purposes of the FVRA).

106.    DHS has established multiple orders of succession and/or delegations pertaining to the Office of the Secretary and other DHS positions.  Those documents are contained in a broader directive, entitled *DHS Orders of Succession and Delegations of Authorities for Named Positions*,

Dep't of Homeland Security, Delegation No. 00106, Revision No. 08.5 (Dec. 15, 2016) (the "DHS Orders," attached hereto as Exhibit D).

107.    From at least December 15, 2016, through and beyond April 11, 2019, Section II.A of the DHS Orders stated in full that: "In case of the Secretary's death, *resignation*, or inability to perform the functions of the Office, *the orderly succession of officials is governed by Executive Order 13753*, amended on December 9, 2016." *Id.* (D-1) (emphases added).

108.    Executive Order 13753 (attached hereto as Exhibit E), in turn, set the order of succession at DHS in cases of resignation of the Secretary.  That Order establishes that succession to the Acting Secretary role must be, in order:

    a.   Deputy Secretary of Homeland Security;

    b.   Under Secretary for Management;

    c.   Administrator of the Federal Emergency Management Agency;

    d.   Under Secretary for National Protection and Programs;

    e.   Under Secretary for Science and Technology;

    f.   Under Secretary for Intelligence and Analysis; and

    g.   Commissioner of U.S. Customs and Border Protection.

109.    From at least December 15, 2016, through and beyond April 11, 2019, Section II.B of the DHS Orders additionally provided: "I [Secretary of Homeland Security] hereby delegate to the officials occupying the identified positions *in the order listed ([at] Annex A)*, my authority to exercise the powers and perform the functions and duties of my office, to the extent not otherwise prohibited by law, *in the event I am unavailable to act during a disaster or catastrophic emergency*."  DHS Orders § II.B (D-1) (emphases added).

36

110.    As of April 10, 2019, Annex A, which, on the face of the DHS Orders, applied *only* when the Secretary is "unavailable to act during a disaster or catastrophic emergency," placed the Commissioner of U.S. Customs and Border Protection third, behind the Deputy Secretary of Homeland Security and the Under Secretary for Management.  DHS Orders, Annex A (D-5).

111.    If, however, the Secretary of Homeland Security resigned, the Commissioner of U.S. Customs and Border Protection remained seventh in the standard order of succession.  *See* Executive Order 13753 § 1 (E-1).

112.    On or about April 9 or 10, 2019, then-Secretary of Homeland Security Kirstjen Nielsen issued an amendment to Annex A ("April 2019 Amendment," attached hereto as Exhibit F).[18]  That April 2019 Amendment did not direct *any* changes to the text of Section II.A of the DHS Orders.  Thus, after faithfully and fully applying the April 2019 Amendment, Section II.A of the DHS Orders still required following Executive Order 13753 for succession in the event of a Secretary's resignation, and Executive Order 13753 still provided that the Commissioner of U.S. Customs and Border Protection was seventh in succession if the Secretary resigned.  *See* DHS Orders § II.A (D-1); Executive Order 13753 § 1 (E-1).

113.    The April 2019 Amendment likewise did not direct any change to the text of Section II.B of the DHS Orders.  Thus, after faithfully and fully applying the April 2019 Amendment, Section II.B continued to identify the sole purpose of Annex A: Annex A is to be applied only in limited circumstances and only to delegate the Secretary's authority when the

---

[18] On or around April 9 or 10, 2019, Ms. Nielsen signed an Amendment to the DHS Orders.  The only action directed by that Amendment was to "strik[e] the text of such Annex [A] in its entirety and insert" a different list of positions "in lieu thereof."  The inserted text listed the Commissioner of U.S. Customs and Border Protection third behind the Deputy Secretary of Homeland Security and Under Secretary for Management.  The Amendment to Annex A labeled and identified the Annex not as an "order of succession," but instead as an "order for delegation of authority."  *Id.* (F-2).

Secretary is "unavailable to act during a disaster or catastrophic emergency."  DHS Orders § II.B

(D-1).  Annex A thus did not—and does not—apply to succession in the case of resignation of the

Secretary of Homeland Security.

### 2. Purported Appointment of the Secretary of Homeland Security.

114.    Secretary Nielsen announced her resignation several days prior to the April 2019

Amendment, on April 7, 2019.  She departed her Office by April 10, 2019.

115.    As of this Complaint's filing, the President has not submitted a nomination for the

vacancy created by Secretary Nielsen's resignation.

116.    At the time of Secretary Nielsen's resignation, and at all times relevant to the Policy

Manual's and Form I-944's promulgation, Senate-confirmed appointees held the Offices of Under

Secretary for National Protection and Programs and Under Secretary for Intelligence and Analysis.

117.    Kevin McAleenan, then serving as the Commissioner of U.S. Customs and Border

Protection, was therefore ineligible at the time of Secretary Nielsen's resignation to become Acting

Secretary of Homeland Security under Section II.A of the DHS Orders.

118.    Mr. McAleenan would have been next in line only under Section II.B of the DHS

Orders, which applied only if the Secretary's unavailability occurred due to a "disaster or

catastrophic emergency."  Section II.B did not apply at the time of Secretary Nielsen's resignation,

because resignation was the basis for her unavailability.[19]

119.    Mr. McAleenan therefore never validly served as the Acting Secretary of Homeland

Security following Secretary Nielsen's resignation.  He also exceeded the 210-day maximum for

---

[19] Mr. McAleenan's involvement in promulgating the Public Charge Rule, which is not at issue in this case, is currently being litigated.  *See* First Amended Complaint, *La Clinica de la Raza v. Trump*, No. 4:19-cv-04980-PJH, Dkt. No. 161 ¶¶ 145–55, 201–03, 207–13 (May 20, 2020).

acting-official service under the FVRA.  He served as the purported Acting Secretary through November 13, 2019, a period of 216 days.

120.    On November 8, 2019, the 211th day of Mr. McAleenan's purported tenure, he issued a directive (attached hereto as Exhibit G), attempting to amend the order of succession for the Secretary of Homeland Security to elevate Under Secretary for Strategy, Policy, and Plans to be fourth in line to lead the agency.  Unlike Secretary Nielsen's April 2019 Amendment, Mr. McAleenan *did* purport to change Section II.A of the DHS Orders such that, like Section II.B, it would now rely upon Annex A to establish the order of succession; thus Annex A for the first time would apply in the case of resignation by the Secretary of Homeland Security.  *See* Amendment to the Order of Succession for the Secretary of Homeland Security (G-1).  Mr. McAleenan's attempted change would have been superfluous if Annex A had otherwise already applied in the case of resignations.

121.    Mr. McAleenan likewise purported to change the order of the positions listed in Annex A, moving the position of Under Secretary for Strategy, Policy, and Plans to fourth in line, behind only the then-vacant Offices of Deputy Secretary of Homeland Security and Under Secretary for Management, as well as the Office then held by Mr. McAleenan, Commissioner of U.S. Customs and Border Protection.  *Id.*

122.    Mr. McAleenan's attempted directive was without force of law because Mr. McAleenan was invalidly serving under the applicable DHS order of succession or because he had exceeded the time limit for acting-official service set forth in the FVRA.[20]

_____

[20] The untimely change to DHS's succession order was invalid even if the FVRA's 210-day limit does not apply to vacancies filled by order of succession designated by other statutes.  If Mr. McAleenan was appointed under the FVRA, the 210-day limit necessarily applied.  If he was appointed under DHS's succession order, he was not next in line and thus never validly held the Acting Secretary position.

123. Mr. McAleenan thereafter resigned. Relying on Mr. McAleenan's invalid succession directive, Chad Wolf, then recently confirmed as Under Secretary for Strategy, Policy, and Plans, purported to become Acting Secretary of Homeland Security.

124. Mr. Wolf could not have served as Acting Secretary of Homeland Security, however, because Mr. McAleenan was without authority to make changes to DHS's succession order.

125. Mr. Wolf could not have served as Acting Secretary under the FVRA because the 210-day limit on such service expired before he purported to assume the Office.

126. Mr. Wolf could not have served as Acting Secretary under any DHS succession order because he was not next in any applicable order of succession except Mr. McAleenan's invalid directive.

127. DHS did not then, and does not as of the filing of this Complaint, have a Secretary authorized to assume the duties of subordinate, vacant offices.

### 3. Purported Appointment of the Director of U.S. Citizenship and Immigration Services.

128. Promulgating the Policy Manual and Form I-944 constitute an "action," "function or duty" of the Director of USCIS. *See* 5 U.S.C. § 3348(a)(1) (defining "action" with reference to 5 U.S.C. § 551(13)); *id.* § 551(13) (defining agency "action" to "include[] the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act"); *see also* 6 U.S.C. § 271(a)(3) (identifying functions of the Director of Bureau of Citizenship and Immigration Services including, *inter alia*, "establish[ing] national immigration services policies and priorities").

129. Thus, if the Office of USCIS Director were vacant, only an individual serving consistent with the FVRA or the Secretary of Homeland Security could promulgate the Policy

Manual and Form I-944.  *See* 5 U.S.C. § 3348(d)(1) ("An action taken by a person who is not acting under [the FVRA] . . . shall have no force or effect."); *see also* 6 U.S.C. § 271(a)(3) (establishing duties of the Director of USCIS).

130.    During the development and promulgation of the Policy Manual and Form I-944, USCIS did not have a lawfully serving Director.

131.    The last Senate-confirmed Director of USCIS, L. Francis Cissna, resigned in April 2019.

132.    Thereafter, Defendant Kenneth Cuccinelli purported to assume the role of Acting Director of USCIS.  Another court in this district has already held invalid that purported service by Mr. Cuccinelli.  *See L.M.-M.*, 2020 WL 985376.

133.    Mr. Cuccinelli purported to serve as the Acting Director of USCIS from June 2019 to November 2019; this includes the date on which the Public Charge Rule was published.

134.    In November 2019, Mr. Cuccinelli ceased purporting to serve as the Acting Director of USCIS, and, upon information and belief, Mr. Wolf appointed Mr. Cuccinelli to serve as both the "Senior Official Performing the Duties of the Deputy Secretary of Homeland Security" and the "Senior Official Performing the Duties of the Director, U.S. Citizenship and Immigration Services."

135.    Mr. Cuccinelli's subsequent appointments were likewise invalid because they occurred at the direction and under the oversight of Mr. Wolf, who himself is not authorized to serve as Acting Secretary of Homeland Security.

136.    Even if Mr. Cuccinelli were lawfully allowed to serve as a "Senior Official," his Office may not take FVRA-defined actions, such as promulgating the Policy Manual or Form I-

944.  *See* 5 U.S.C. § 3345(a) (identifying permissible individuals to serve as acting officials). These actions are therefore invalid.

## CAUSES OF ACTION

### COUNT ONE (Administrative Procedure Act)

### Unlawful Failure to Follow Federal Statute and Regulations

137.    Plaintiffs reallege the foregoing allegations as if set forth fully herein.

138.    The Policy Manual and Form I-944 conflict with federal regulation and statute, so are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and are in excess of statutory jurisdiction, authority, or limitations, or short of statutory right.  5 U.S.C. § 706(2)(A), (C).

139.    The Policy Manual and Form I-944 constitute final agency action.  They are the consummation of the Defendants' process on this matter.  Rights and obligations have been determined by the Policy Manual and Form I-944 and legal consequences will flow from them. DHS and USCIS will deem applicants inadmissible based on the Policy Manual and Form I-944.

140.    The Policy Manual's incorporation of a "clearly and beyond doubt" standard of proof for public charge admissibility determinations conflicts with the plain text of the INA, the Public Charge Rule, and longstanding practice, which require the preponderance of the evidence standard outside the context of removal proceedings.

141.    The Policy Manual's changes to certain application factors, including adjustment of status to become a lawful permanent resident and lack of health insurance, conflict with the INA and the Public Charge Rule.  The Policy Manual unlawfully disadvantages applicants in conflict with the INA and the Public Charge Rule.

142.     Form I-944 directs collection of information that the Public Charge Rule states may not be considered when determining whether an applicant is inadmissible as a public charge or that the Rule and the INA deem unnecessary.

## COUNT TWO (Administrative Procedure Act)

### Promulgation of Legislative Rule Without Observance to Required Procedures

143.     Plaintiffs reallege the foregoing allegations as if set forth fully herein.

144.     The Policy Manual and Form I-944 enact legislative rules without observance of procedure required by law.  5 U.S.C. § 706(2)(D).  They alter the substantive rights and obligations of applicants.  They also effect rules that agency personnel must apply.

145.     The Policy Manual's requirement that adjudicators apply and applicants meet the "clearly and beyond doubt" standard is a legislative act.  By changing the standard of proof from the preponderance of the evidence standard to a "clearly and beyond doubt" standard, the Policy Manual makes it substantially more difficult for an applicant to prove her admissibility— fundamentally altering the amount and nature of evidence needed to prove her case.  The Policy Manual thus alters the rights and obligations of applicants.

146.     The Policy Manual's altered treatment of certain application factors changes applicants' federally established rights through a binding agency directive.

147.     Form I-944 directs applicants to collect and agency officials to consider information beyond what is contemplated or authorized by the Public Charge Rule or the INA.

## COUNT THREE (Administrative Procedure Act)

### Arbitrary and Capricious Agency Action

148.     Plaintiffs reallege the foregoing allegations as if set forth fully herein.

149.     The Policy Manual and Form I-944 depart from agency regulation, policy, and practice without recognition or explanation, are unclear, or are internally inconsistent, so are

arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

150.    The Policy Manual does not display awareness of, or explain its change to, the standard of proof in admissibility determinations outside the removal context from longstanding practice and prior policy utilizing the preponderance of the evidence standard. The Policy Manual's use of "clearly and beyond doubt" is unprecedented and internally inconsistent with other passages of the Policy Manual that provide for the preponderance of the evidence standard.

151.    The Policy Manual does not explain its altered treatment of certain factors about an applicant—an arbitrary departure from binding agency regulation.

152.    Form I-944 either directs collection of information for impermissible use or else directs collection of information that the agency will not use. It collects unnecessary, invasive, and burdensome information without explaining why this information is necessary in all cases or why failure to furnish all of this documentation should result in rejection or denial of applications. Form I-944 does not explain how or why, or display awareness that, it departs from regulation, policy, or practice.

### COUNT FOUR (Federal Vacancies Reform Act)

#### Unlawful Appointment

153.    Plaintiffs reallege the foregoing allegations as if set forth fully herein.

154.    Both the Secretary of Homeland Security and the Director of USCIS may be appointed by the President only with the advice and consent of the Senate. 6 U.S.C. §§ 112(a)(1), 113(a)(1)(E).

155.    Unless statute otherwise provides, the Federal Vacancies Reform Act supplies the exclusive means through which a President may fill resignation-created vacant offices that would otherwise require Senate confirmation.

156.    When such office is vacant, only a validly serving Acting Secretary may perform the functions or duties of the Position.

157.    Promulgating the Policy Manual and Form I-944 constitute an "action . . . in the performance of a[] function or duty" of the Office of the Director of USCIS under 5 U.S.C. § 3348(d)(1).

158.    At the time USCIS promulgated the Policy Manual and Form I-944, the FVRA required that both the Office of the Secretary of Homeland Security and the Office of the Director of USCIS remain vacant.

159.    As a result, no officer could perform the function or duties of the Director of USCIS, so no officer could promulgate the Policy Manual or Form I-944.

160.    Likewise, no officer could perform the duties of the Secretary of Homeland Security, to whom the Director of USCIS's powers would devolve during a vacancy.  *Id.* § 3348(b)(2).

161.    The unlawful issuance of the Policy Manual and Form I-944 must "have no force or effect" and cannot be ratified.  *Id.* § 3348(d).

### COUNT FIVE (Administrative Procedure Act)

### Unlawful Action Without Observance of Procedure Required By Law

162.    Plaintiffs reallege the foregoing allegations as if set forth fully herein.

163.    Under the Administrative Procedure Act, a court must "hold unlawful and set aside agency action, findings, and conclusions" that are "not in accordance with law;" or "in excess of statutory . . . authority;" or issued "without observance of procedure required by law."  5 U.S.C. § 706(2)(A), (C), (D).

164.    Adoption of the Policy Manual and Form I-944 require approval of the Director of USCIS or, during a vacancy of that Office, a validly serving Secretary of Homeland Security.

165.     These Offices were required to remain vacant when USCIS promulgated the Policy Manual and Form I-944.  Neither Defendant Kenneth Cuccinelli nor Defendant Chad Wolf was authorized to exercise the powers of those Offices.

166.     The Policy Manual and Form I-944 therefore must be set aside under the APA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court:

A.     Declare that the USCIS Policy Manual at Volume 8, Part G, implementing "public charge" admissibility, is arbitrary and capricious, contrary to law, adopted without required procedure, and/or in excess of legal authority;

B.     Declare that Form I-944, "Declaration of Self-Sufficiency," is arbitrary and capricious and contrary to law, adopted without required procedure, and/or in excess of legal authority;

C.     Enjoin Defendants, including DHS, USCIS, and its employees, officers, and agents, from implementing the Policy Manual and Form I-944;

D.     Award attorneys' fees and litigation costs;

E.     Award any other relief the Court deems just and proper.

July 13, 2020                                              Respectfully submitted,

                                                          */s/ Matthew E. Price*
Jesse M. Bless (D.D.C Bar # MA00020)      Matthew E. Price (D.C. Bar # 996158)
AMERICAN IMMIGRATION LAWYERS ASS'N        Elizabeth B. Deutsch (D.C. Bar # 1719602)
1301 G Street, NW                         (D.D.C. application pending)
Suite 300                                 JENNER & BLOCK LLP
Washington, DC 20005                      1099 New York Avenue, NW
Tel.: 781-704-3897                        Suite 900
Fax: 202-783-7853                         Washington, DC 20001
jbless@aila.org                           Tel.: 202-639-6000
                                          Fax: 202-639-6066
                                          mprice@jenner.com
                                          edeutsch@jenner.com

Max S. Wolson (D.D.C. Bar # 229562)
NATIONAL IMMIGRATION LAW CENTER
P.O. Box 34573
Washington, DC 20043
Tel.: 202-216-0261
Fax: 202-216-0266
wolson@nilc.org

Gabrielle Lessard*
Nicholas Espíritu*
NATIONAL IMMIGRATION LAW CENTER
3450 Wilshire Boulevard
#108-62
Los Angeles, CA 90010
Tel.: 213-639-3900
Fax: 213-639-3911
lessard@nilc.org
espiritu@nilc.org

Eleanor Pelta (D.C. Bar # 418076)
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
Tel.: 202-739-3000
Fax: 202-739-3001
eleanor.pelta@morganlewis.com

Joanna Elise Cuevas Ingram**
NATIONAL IMMIGRATION LAW CENTER
P.O. Box 170392
Brooklyn, NY 11217
Tel.: 213-377-5258
Fax: 213-377-5258
cuevasingram@nilc.org

*Pro hac vice motion forthcoming.  Admitted to practice in California.
**Pro hac vice motion forthcoming.  Admitted to practice in New York and California.